UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN SAMPSON, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UKIAH VALLEY MEDICAL CENTER, et al.,<br><br>    Defendants. | Case No. 15-cv-00160-WHO<br><br>**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 92, 95 |

The motions for summary judgment of defendants CALSTAR and MEDSTAR raise an important issue: under California law, can emergency medical personnel be found grossly negligent when they have provided some significant amount of care while failing to take other action that might have been more successful? In this sad case, plaintiffs' son Andrew Sampson died after an automobile accident. While there are differences of opinion on a variety of facts surrounding the care provided by CALSTAR and MEDSTAR personnel, taking the facts in the light most favorable to plaintiffs there was no gross negligence. I GRANT the motions.

## BACKGROUND

At approximately 2:20 a.m. on January 11, 2014, plaintiffs' son Andrew was involved in a single car, rollover incident. Second Amended Complaint ("SAC") ¶ 12 (Dkt. No. 49). The accident was not discovered until 4:06 a.m. (*id*. ¶¶ 12-13), and at 4:07 a.m. California Highway Patrol (CHP) was dispatched to the scene. The reporting officer arrived at 4:14 a.m. and observed a vehicle on its roof and Andrew lying next to the car. *Id*. ¶ 13.

Ukiah Ambulance Service, operated by defendant MEDSTAR, was dispatched to the scene and arrived at 4:21 a.m. Andrew was assessed and treated by MEDSTAR paramedic Cameron McFadden. There is no dispute that according to the readings taken by McFadden at the scene, Andrew was in distress (although conscious and able to response to simple commands) and his vital signs were deteriorating.

Following initial notification and confirmation from CHP that the road near the accident

site would be closed to allow for landing, CALSTAR's helicopter was dispatched from Ukiah Municipal Airport at 4:38 a.m. The pilot-in-command was Josh Judge and two CALSTAR nurses – Courtney Holbrook Farris and Jaromie Power – were aboard. The CALSTAR helicopter attempted to land, but because of "brown out" conditions was unable to do so. Deposition Transcript of Josh Judge at 24:2-10 (Ex. K to the Declaration of Douglas de Heras [Dkt. No. 92-14]). In light of timing concerns, the decision was made to abort the landing, send Andrew by MEDSTAR ground ambulance to UVMC, and have CALSTAR meet up with the MEDSTAR ambulance at UVMC. Judge Depo. Tr. at 46-52; Declaration of Michael Giannini [Dkt. No. 95-1], ¶¶ 16-17.[1]

Plaintiffs contend that the decision to abort the helicopter landing (to waive off the helicopter) and transport Andrew to UVMC by ambulance was made by MEDSTAR paramedic McFadden. Declaration of Jon Nevin [Dkt. No. 103], ¶ 10. Plaintiffs assert that McFadden, prior to deciding to transport Andrew by ground transportation to UVMC, failed to follow the Coastal Valleys EMS Agency Protocol 7007.4 by failing to seek guidance as to the plan of transfer with someone with higher level medical credentials. Nevin Decl. ¶ 11. They argue that McFadden did not, but should have, discussed the status of Andrew's vitals/conditions and the "appropriate" trauma center to direct Andrew to with either the flight nurses then aboard the CALSTAR helicopter that was in flight or with Dr. Marks at UVMC. Nevin Decl. ¶¶ 20-223; Oppo. to MEDSTAR MSJ at 9. MEDSTAR contends, however, that McFadden did discuss Andrew's condition and vitals with someone at UVMC and received approval to transport Andrew by ground to UVMC. Deposition Testimony of Cameron McFadden at 30:3-13; 30:18-31:2; 31:9-23; 31:24-32:11; 49:11-20 (Ex C. to Declaration of Gerald S. Richelson [Dkt. No. 104]; Ex. C to Reply Declaration of Jianlin Song). McFadden argues that he was required to take Andrew to UVMC in light of his unstable vitals and that deciding to "bypass" UVMC was not within his

---

[1] CALSTAR's expert, Howard Ragsdale, explains that the pilot in command must use "extreme caution" in landing in areas where dust conditions are present and the pilot is given final authority to decide whether it is safe to land. Declaration of Howard Ragsdale [Dkt. No. 92-2], ¶ 12. Plaintiffs do not present any facts, or argument, in an attempt to show that Judge's decision not to land given the brown out conditions was grossly negligent. Plaintiffs do not mention Judge at all in their Opposition.

authority.[2] *Id.*

The MEDSTAR ambulance departed with Andrew at 4:42 a.m. and arrived at Ukiah Valley Medical Center ("UVMC") at 5:04 a.m. The CALSTAR helicopter also headed to UVMC, and arrived at 5:04 a.m.

Andrew was admitted to UVMC and examined by Dr. Marks at UVMC at 5:09 a.m. At UVMC, an X-ray was taken and tests administered, and Andrew was given two units of saline. Following that treatment, Andrew's blood pressure was normal and his pulse improved. Marks diagnosed Andrew as suffering from multiple fractures, blunt chest trauma, head trauma, resulting in internal bleeding and a hemothorax (bodily fluid collecting between the lung and chest cavity). Expert Report of Karen V. Tomczak [Dkt. No. 99-3] at 3-4; Declaration of Ralph W. Robinson, Ex. G [Dkt. No. 95-9]. Plaintiffs contend that a patient with these injuries should have been intubated to ensure a sufficient supply of oxygen until surgical intervention. Declaration of Dr. Davis Goldschmid [Dkt. No. 104-6] ¶¶ 36, 38. Marks secured approval from a doctor at Santa Rosa Memorial Hospital ("SRMH"), the trauma center destination of choice according to CALSTAR and MEDSTAR, to transfer Andrew there. Marks informed the doctor at SRMH that Andrew had not been intubated. Deposition Transcript of Debbie L. Marks 74, Ex. O to de Heras Decl. [Dkt. No. 92-18].

There is a dispute over the time that Andrew was discharged from UVMH into the care of the MEDSTAR and CALSTAR personnel, as different organizations' records show time of discharge as either 5:22 or 5:28 or 5:37 or 5:43 a.m. There is no dispute that Andrew was discharged for ground transportation via the MEDSTAR ambulance to SRMH.[3] CALSTAR flight

---

[2] MEDSTAR's expert asserts that there is no protocol for a paramedic on the ground conferring with in-flight nurses above, when the communications channel had to be left open for landing instructions or other critical safety communications. Reply Declaration of Michael Giannini [Dkt. No. 106-2] ¶ 8.

[3] CALSTAR and its expert, Howard Ragsdale, also explain in detail why the CALSTAR helicopter was not used to transport Andrew to SRMH (fog conditions) or to Davis Medical Center (freezing conditions). And that while transport by air could have been accommodated to SRMH despite the fog, the fog required taking a longer flight pattern and landing away from SRMH (at the airport, instead of the hospital). Those added issues meant that the flight time exceeded the ground transportation time. Ragsdale Decl. 13-15. Plaintiffs do not attempt to raise disputes of fact to undermine the assertions by CALSTAR that air transportation was not a more

3

nurses Farris and Power boarded the ambulance to provide the medical care for Andrew, and MEDSTAR paramedic McFadden was to assist with the care. Nevin Decl. ¶ 15.[4]

There is also a dispute as to when the first set of vitals was taken once Andrew was back in the ambulance and to whom those vitals were communicated. Plaintiffs contend that at 5:22 a.m., Andrew's vitals were likely taken by McFadden (as shown in the California EMS reports). According to that "reading," Andrew's pulse and blood pressure were deteriorating and Andrew was "unstable." Nevin Decl. ¶ 16; California EMS Report [Dkt. No. 95-12] MAMC 0121. Plaintiffs allege that McFadden failed to "sufficiently and emphatically" inform Farris and Power as to Andrew's deteriorating condition at that time, as evidenced by the failure of this reading to make it into CALSTAR's records. Nevin Decl. ¶ 24; Oppo. to MEDSTAR MSJ at 6. Defendants dispute whether these vitals were actually taken, or if they were taken, when they were taken. Giannini Reply Decl. ¶¶ 14-15.[5] Defendants argue that if these vitals were taken, it would be logical that the CALSTAR nurses would have been aware of them given the small space in the ambulance and the close proximity of McFadden (who may have taken the readings but cannot remember doing so), Farris and Power. *Id.* ¶ 13.

Plaintiffs also point out that some of the equipment in the ambulance was not working, forcing paramedic McFadden and nurses Farris and Power to "waste precious time" troubleshooting the equipment problem and McFadden to take manual readings. Tomczak Decl. ¶

---

reasonable option, much less that the decision to use ground transportation was grossly negligent. As noted above, plaintiffs also do not raise any facts or make any argument that CALSTAR's failure to land at the accident cite was grossly negligent. Therefore, CALSTAR's motion is GRANTED as to the allegations regarding the failure to transport Andrew either from the accident site or from UVMC to another facility.

[4] MEDSTAR EMT Bennet Leda was driving the ambulance. Plaintiffs do not discuss Leda or attempt to show that his conduct was grossly negligent.

[5] Defendants assert the 5:22 a.m. reading is a mistake, as it is not "attributed" to any set of personnel as all the other readings are, and as it is undisputed that the equipment which would have taken an automatic blood pressure reading was not working at that time. California EMS Report MAMC 0121. I note that the 5:22 a.m. reading reports *exactly* the same data (pulse, blood pressure, "GCS", respiratory effort) as the prior reading from 5:04 a.m. taken by McFadden. *Compare* MAMC 0117 *with* MAMC 0121. None of the other readings in the California EMS charts have exactly the same data, strongly suggesting that the 5:22 a.m. entry was an accidental repeat of the 5:04 a.m. reading.

8.[6] Plaintiffs contend that given the 5:22 a.m. reading showing that Andrew was coding and the malfunctioning equipment, it was grossly negligent of McFadden, Farris, and Power to depart UVMC for SRMH rather than inform Dr. Marks and take Andrew back inside UVMC for stabilization.

Despite the dispute in the record over whether the 5:22 a.m. readings were taken, the parties agree that the ambulance departed UVMC at 5:28 a.m. Andrew was loaded and secured will "full spinal precautions," oxygen was administered using a manual mask, warming measures (blankets and headers) were used, and intravenous fluids (saline) were continually administered. Declaration of Robert C. Mackersie [Dkt. No. 92-1], ¶ 19. However, within minutes of the departure, Andrew was having trouble breathing and his pulse was continuing to weaken. Declaration of Karen V. Tomczak [Dkt. No. 99] ¶ 12. Andrew was intubated and, shortly thereafter, had a cardiac arrest. CPR was initiated. CALSTAR nurses administered epinephrine at 5:37 a.m. (just nine minutes after departing UVMC). Instead of turning back to UVMC, the closest emergency room, the ambulance continued on and was eventually diverted to Healdsburg District Hospital, where Andrew was pronounced dead at 6:18 a.m.

CALSTAR and MEDSTAR move for summary judgment on the remaining claims asserted against them; (i) gross negligence and bad faith (Third Cause of Action); (ii) wrongful death (Fourth Cause of Action); and (iii) survival action (Fifth Cause of Action).

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

---

[6] Plaintiffs argue that a 5:24 a.m. blood pressure reading from an automated monitor is "suspect" because the monitor was not working and did not record another reading until 5:43 a.m. CAL0023. Plaintiffs argue the more accurate blood pressure reading was the one taken by MEDSTAR by manual cuff at 5:22 a.m. Oppo. to MEDSTAR MSJ at 5.

made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id*. at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir.1979).

Under California law, the standard of care for emergency personnel – including the MEDSTAR and CALSTAR personnel – is gross negligence. *See* Cal. Health & Safety Code 1799.106 (providing that emergency medical personnel "who render[] emergency medical services at the scene of an emergency or during an emergency air or ground ambulance transport shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or acts or omissions not performed in good faith."). Gross negligence is "the want of even scant care or an extreme departure from the ordinary standard of conduct." *See, e.g., City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 754 (2007); *Cooper v. Bd. of Med. Examiners*, 49 Cal. App. 3d 931, 941 (Cal. Ct. App. 1975).

Generally, where a plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff. *See, e.g.*, *Sanchez v. Kern Emergency Med. Transportation Corp.*, 8 Cal. App. 5th 146, 153 (Cal. Ct. App. 2017), *as modified* (Feb. 16, 2017) (relying on *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 (2007)). Where a moving defendant supports a motion for summary judgment with expert declarations, plaintiff must come forward with conflicting expert evidence. *Id*.

**DISCUSSION**

**I. CALSTAR'S MOTION FOR SUMMARY JUDGMENT**

CALSTAR relies on the expert declaration of Dr. Robert C. Mackersie [Dkt. No. 92-1], a specialist in trauma surgery, professor of surgery, and certified Advanced Trauma Life Support instructor, to support its motion. After reviewing undisputed facts, he opines that Farris and Power acted in good faith and were not grossly negligent in the provision of care to Andrew. Mackersie Decl. ¶¶ 29 a. – c. He finds that Farris and Power provided significant medical treatment and care to Andrew, including providing oxygen via a non-rebreather mask, full spinal precautions for transportation, warming measures, IV fluids, and intubation. Mackersie Decl. ¶ 19. When Andrew went into cardiac arrest, the nurses administered "advance cardiac life support medications," performed CPR, performed bilateral needle thoracostomies, and administered additional IV fluids. *Id*. Based on performing those steps, Mackersie opines that the care provided was not "want of scant care" or a "gross departure" from what a reasonably careful person would do in the same or similar circumstances. *Id*. ¶¶ 27, 29.

Plaintiffs counter with the opinion of Karen Tomczak that Farris and Power were grossly negligent in: (i) departing UVMC while Andrew was not stable; (ii) leaving UMVC while the monitoring equipment in the ambulance was still not functioning; (iii) failing to return to UVMC (a level IV trauma center) when Andrew started coding (nine minutes after departure), and instead continuing towards Santa Rosa, which was more than an hour away; (iv) failing to administer any of the blood they were provided by Dr. Marks, and instead administering more saline contrary to normal standards; and (v) failing to provide that saline without the pressure backs.[7]

CALSTAR argues that Tomczak failed in her expert report to opine that the treatment provided by Farris and Power was grossly negligent and so failed to create a dispute of fact. In opposition, plaintiffs submitted a declaration from Tomczak that repeats essentially the conclusions from her expert report – that the CALSTAR nurses failed to meet "the applicable

---

[7] As noted above, plaintiffs make no argument or present any evidence regarding whether the CALSTAR pilot in command Josh Judge was grossly negligent. CALSTAR's motion for summary judgment is GRANTED with respect to claims regarding Judge's actions.

7

standard of care" – but expressly identifies the standard of care as gross negligence and opines that the nurses were grossly negligent. Tomczak asserts that each of the five actions identified above shows that "scant care" was provided, identifying as the "most extreme" example the failure of Farris and Power to return Andrew to the care of UVMC either before departing UVMC or soon thereafter because within minutes of their departure they admittedly recognized that Andrew was coding. Tomczak Decl. ¶¶ 8-10, 12-13.

CALSTAR contends that even if the new Tomczak declaration is admissible, it is not reliable and not persuasive because nowhere does Tomczak address the care that *was* provided to Andrew – the continued provision of oxygen via a non-rebreather mask, continued full spinal precautions for loading and transportation, warming measures including blankets and heaters, continued IVs and IV fluids, intubation, administration of medicines, and performing CPR after the cardiac arrest – that (according to CALSTAR) establishes as a matter of law that the care provided by Farris and Power was neither scant nor an extreme departure.

### A. Admissibility of Tomczak's Declaration

CALSTAR points out deficiencies in Tomczak's declaration but none require me to strike it. CALSTAR argues that the declaration contradicts her report – which did not identify the applicable standard of care – by purporting to opine that Farris and Power were grossly negligent. CALSTAR also characterizes Tomczak's Declaration as an impermissible supplemental expert report, submitted in violation of expert disclosure requirement and agreed-to deadline of March 3, 2017. Plaintiffs respond that in her report Tomczak opined that the nurse's care fell below "the applicable" standard of care and the declaration simply clarifies what that standard is. Plaintiffs also point out that the Tomczak declaration was filed before the April 11, 2017 expert discovery cut-off.

CALSTAR also argues that the Tomczak declaration should be rejected because it is based on assumptions without evidentiary support and rests on speculation and conjecture. CALSTAR Reply at 5-6. That argument is based on Tomczak's failure to acknowledge the care that was given to Andrew and her singular focus on what was not done. A similar accusation could be leveled at CALSTAR's expert Mackersie, who does not address the alleged failures of care by the

8

CALSTAR nurses identified by plaintiffs and Tomczak in her expert report, but only the care admittedly provided.

CALSTAR then contends that Tomczak's declaration should be struck because she is not qualified to render an opinion as to gross negligence under Cal. Health & Safety Code section 1799.106. CALSTAR Reply 6-8. CALSTAR's argument rests on Tomczak's description of her opinions as based on her training and practice in the Emergency Room where the gross negligence standard does not apply. Instead, according to CALSTAR, the opinions of Mackersie demonstrate summary judgment should be granted in its favor. While Mackersie is distinguished and eminently experienced in the fields of trauma surgery and advanced trauma life support, CALSTAR does not explain his expertise regarding the gross negligence standard applicable to medical personnel operating at the scene of an accident or in transport, a similar supposed defect that CALSTAR identifies with respect to Tomczak.

I will not strike the Tomczak declaration on any of these grounds. Its deficiencies weigh in the resolution discussed below.

### B. Want of Scant Care or Extreme Departure from Standard of Care

The issue boils down to whether the provision of some significant amount of care – *e.g.*, the measures of care identified by Mackersie – means as a matter of law that the CALSTAR personnel were not grossly negligent in failing to provide the care identified by Tomczak; *i.e.*, departing in an ambulance with certain pieces of non-functioning equipment, failing to stay or return to UVMC when Andrew coded, and failing at any time to provide blood and/or pressure backed saline. Said another way, did these failures amount to scant care or an extreme departure of care for someone with Andrew's injuries and symptoms, despite that care was provided? Neither side provides any case law discussing the application of the gross negligence standard in a similar situation. However, the undisputed evidence is that some significant amount of care was provided to Andrew.

While Tomczak argues that the CALSTAR nurses were grossly negligent in failing to take certain steps (primarily, returning to UVMC and instead continuing on towards SRMH), she does not address the care that was provided; the intubation, the CPR, the drugs administered while the

9

ambulance was in active transport. Nor does Tomczak contest Mackersie's opinion that the care that was actually provided meant the nurses could not have been grossly negligent. *Cf. Sanchez v. Kern Emergency Med. Transportation Corp.*, 8 Cal. App. 5th 146, 162 (Cal. Ct. App. 2017), *as modified* (Feb. 16, 2017) ("When the moving papers undermine the assumptions on which the opposing expert's opinion is based, the opposing expert must do more than simply assert those discredited assumptions in order to meet the admissibility requirements of Evidence Code section 801, subdivision (b)."). In these circumstances, plaintiffs have failed to raise a material fact showing that the care provided to Andrew was an "extreme departure" from what an emergency nurse should have reasonably provided or was "scant care" given his known injuries and symptoms.

The California Legislature has made the determination that emergency medical personnel should not be subjected to liability for their efforts to serve the public unless there is gross negligence – "the want of even scant care or an extreme departure from the ordinary standard of conduct." There is an argument in this case that the nurses should have ordered the ambulance to turn around when Andrew went into cardiac arrest, or done the other things suggested by Tomczak. But the nurses here were undeniably taking steps to try to save Andrew's life in the ambulance, and no reasonable jury could find that their conduct amounted to an extreme departure from the ordinary standard of conduct.

## II.    MEDSTAR'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs argue MEDSTAR paramedic McFadden failed Andrew in: (i) making no effort to consult with UVMC or the flight nurses regarding the appropriate trauma point of entry, as required by the Coastal Valley EMS Agency protocols; (ii) failing to inform Dr. Marks that Andrew was coding at 5:22 a.m., before the ambulance departed UVMC; and (iii) failing to "sufficiently and emphatically" inform nurses Farris and Power of Andrew's deteriorating condition from the 5:22 a.m. vital readings. Their expert, Jon Nevin (a paramedic with 18 years of experience), identified only two acts of gross negligence.[8] Nevin Decl. ¶ 1. First, "it was

---

[8] Also, despite mentioning these issues in passing in their briefing, plaintiffs make no argument or attempt to identify disputes of fact as to whether waiving off the helicopter or failing to consult

below the standard of care and incomprehensible" that McFadden "gave no consideration" to bypassing UVMC in favor of SRMH at the accident scene. Nevin Decl. ¶ 23. Second, McFadden's care for Andrew "grossly fell below the standard of care" when McFadden's knew of Andrew's deteriorating vitals at 5:22 a.m. but made no attempt to seek further care from Marks/UVMC and the ambulance was allowed to depart. Nevin Decl. ¶ 25.[9]

MEDSTAR relies on the expert declarations of Michael Giannini, a paramedic of over 35 years, who argues that McFadden's conduct was not grossly negligent. Dkt. No. 95-1; *see also* Reply Giannini Decl. [Dkt. No. 106-2]. No reasonable jury could disagree with his conclusion.

### A. Decision to Transport to UVMC

As to McFadden's initial decision to send Andrew to UVMC, Giannini opines that it was in compliance with the Coastal Valleys EMS Policy, which required transportation to the closest emergency department given Andrew's deteriorating vital signs. Giannini Decl. ¶¶ 18-19; *see also* Policy No. 7007.4 [Dkt No. 106-1]. Giannini also opines that McFadden complied with Policy 7007 in that he did consult with a "base station" doctor – someone at UVMC – prior to determining that Andrew should be transported by ground to UVMC. Citing McFadden's deposition, Giannini asserts that McFadden not only described Andrew's condition over the radio but also "stipulated" that upon arrival at the UVMC emergency department a decision could be made as to whether Andrew should be immediately be transported elsewhere via helicopter or taken into the UVMC emergency department. Giannini Reply Decl. ¶ 6. Even more significantly, Giannini states there was no duty on McFadden to consider the possibility of direct ground transportation from the scene to SRHC because under the applicable Policy (7007.4) Andrew's deteriorating vital signs *required* him to be transported to UVMC as the nearest emergency

---

with the flight nurses constituted gross negligence.

[9] Plaintiffs also rely on the expert declaration of Dr. David Goldschmid [Dkt. No. 104-6], to discuss why a patient with the injuries and vitals Andrew had meant Andrew should have been intubated at UVMC. Dr. Goldschmid in his declaration opines on the treatment of Andrew by Dr. Marks at UVMC, but does not mention McFadden, much less address whether McFadden breached the applicable "grossly negligent" standard of care.

11

department. *Id.* ¶ 9.[10]

In his deposition, McFadden testified as follows:

> Q. With Shane Penland, where the two of you made the decision to transport the patient by ambulance, did you discuss whether to transport him by ambulance to UVMC only or did you consider other hospitals?
>
> A. That's my base hospital. That's the only -- that's where I would transport to. It's the closest facility.
> …
> Q. In your discussion with Shane Penland regarding whether or not to transport the patient by ambulance, was there any discussion on whether or not UVMC was the appropriate care facility for the patient?
> …
> A. There was no discussion about if I could go somewhere else. It was my base hospital. It's the place I would take him.
> …
> Q. There is a note here saying that you were going to transport to UVMC and meet the CALSTAR 4 crew there. Was the -- and did you have any intent to transfer the patient to the CALSTAR 4 crew, as opposed to the E.R. at UVMC, or was it only -- or was it to UVMC, or did you not have an intent either way, at the time of the transfer?
>
> A. I was trying to do what was best for the patient. If they weren't going to be able to land at the scene, for whatever reasons, and they wanted to take the patient to another facility, because they felt they needed another facility, and they would get approval for that, then I wanted to have -- to have them meet me at Ukiah Valley Medical Center, to make that determination for what was best for the patient.
> …
> Q. Okay. So, the call on whether or not they were going to fly the patient to another facility was going to be left to the CALSTAR 4 crew and presumably the doctors at Ukiah Valley Medical Center?
> . . .
> A. I would say yes.
> . . .
> Q. Did you make a determination on the morning of the accident of whether or not Santa Rosa Memorial Hospital was within a 60-minute transport time from the scene of the accident?
>
> A. No, I did not. It's my base hospital. I have to contact my base hospital. My base hospital is Ukiah Valley Medical Center. That's where I have to take my patient. I made contact with them. The patient wasn't stable enough to be transported by any other -- or by a ground ambulance to another facility.

---

[10] Giannini also argues that the Policy guidelines regarding when a local trauma center can be bypassed were not applicable to the incident at issue because they apply only when the local trauma center has put itself on bypass (in other words, unavailable) status and a field paramedic like McFadden has no authority to make that determination. *Id.* ¶ 11.

12

Deposition of Cameron McFadden at 30:3-13; 30:18-31:2; 31:9-23; 31:24-32:11; 49:11-20 (Ex C. to Declaration of Gerald S. Richelson [Dkt. No. 104]; Ex. C to Reply Declaration of Jianlin Song).

McFadden also testified that he had an "order" from UVMC to transport Andrew there testifying that in his conversation with UVMC:

> A. I did not request a divert. I requested – I gave them – in a radio report, I gave [them] a rundown of the patient and his condition, and I said I was coming to rendezvous with the CALSTAR 4 crew, to make a determination if he could go with the CALSTAR 4 crew or come into the E.R.
>
> Q. And the doctor signed off on that plan or . . .
>
> A. Yeah.

*Id*. at 50:20-51:2. Finally, McFadden testified that the decision to bypass and transport a patient directly to a hospital with a higher level of care than available at his base hospital did "not lie" within his power. *Id*. at 56:17-25.

Given the language of the Policies under which McFadden was operating and his testimony, plaintiffs have failed to raise a dispute of fact that a jury could rely on to show that McFadden's failure to consider or request a diversion directly to SRMH was grossly negligent. Under undisputed facts, McFadden was complying with the applicable EMS Policies and could not have been grossly negligent.

### B. Impact of Alleged 5:22 a.m. Vital Readings

As an initial matter, Giannini explains that under California law the person ultimately responsible for medical management of a patient is the most medically qualified person on the scene. Giannini Decl. ¶¶ 7-9.[11] Therefore, while McFadden was in charge at the accident scene and for the initial transportation to UVMC, once the CALSTAR nurses boarded the ambulance, the care of Andrew was in those nurses' control. Giannini Reply Decl. ¶ 14.

Giannini argues that *if* the vital signs were taken by McFadden at 5:22 am, given they

---

[11] Cal. Health & Safety Code § 1798.6 provides that "[a]uthority for patient health care management in an emergency shall be vested in that licensed or certified health care professional, which may include any paramedic or other prehospital emergency personnel, at the scene of the emergency who is most medically qualified specific to the provision of rendering emergency medical care."

13

indicated "significant shock" the vitals "would have been conveyed immediately" to the CALSTAR nurses in charge at that time, especially in light of the confined space of the compartment, and any actions based on them was up to the CALSTAR nurses. Giannini Reply Decl. ¶ 13.[12] There is no doubt that this is the only reasonable inference one can take from the facts.

Drawing the reasonable inferences in plaintiffs favor, I will assume for ruling on this motion that a blood pressure reading was taken by McFadden at 5:22 a.m. prior to the departure of the ambulance from UVMC. If this occurred, McFadden was still not grossly negligent because the responsibility for making a decision based upon that reading lies with the CALSTAR nurses. Other than speculation of plaintiffs' expert Nevin, there is no evidence in the record that McFadden *did not* communicate the 5:22 a.m. reading to the CALSTAR nurses. MEDSTAR points out that neither McFadden nor Power was asked at deposition if they communicated regarding the 5:22 a.m. readings. And when asked about the 5:22 a.m. reading in her deposition, nurse Farris simply responded that she did not know who took that "assessment." Song Reply Decl., Ex, E Farris Depo. Tr. at 34:25 – 36:5.

On this record, and after Andrew was in the care of the CALSTAR nurses, McFadden cannot be found to have been "grossly negligent" for either failing to inform Marks at UVMC of the 5:22 a.m. reading or for, as plaintiffs put it, failing to "sufficiently and emphatically" inform nurses Farris and Power of Andrew's deteriorating condition. MEDSTAR's motion for summary judgment is GRANTED. There are no material disputed facts that reasonably construed in

---

[12] Giannini also contends that given the timing of events which are agreed-to and the fact that vitals are usually not taken until after an ambulance departs and is on the way, it was unlikely that a blood pressure reading was taken at 5:22 a.m. (as apparently recorded in the California EMS records) and that log entry was more likely triggered by the timing of the notification to dispatch of the transfer request to SRMH. *Id*. ¶ 15.

14

plaintiffs' favor, could lead to a conclusion that McFadden was grossly negligent.

## CONCLUSION

CALSTAR's and MEDSTAR's motions for summary judgment are GRANTED in full.

**IT IS SO ORDERED.**

Dated: May 5, 2017



William H. Orrick
United States District Judge