UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| ALAN SAMPSON, et al., | Case No. 15-cv-00160-WHO |
|---|---|
| Plaintiffs, | |
| v. | **ORDER ON UKIAH VALLEY MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT** |
| UKIAH VALLEY MEDICAL CENTER, et al., | Re: Dkt. No. 119 |
| Defendants. | |

One of three remaining defendants in this case, Ukiah Adventist Hospital, aka Ukiah Valley Medical Center (UVMC), moves for summary judgment.[1] UVMC argues that it is entitled to summary judgment on plaintiffs' claims for medical negligence and violation of the Emergency Medical Treatment and Labor Act (EMTALA) because it cannot be liable for the care provided to plaintiffs' son, Andrew, by Dr. Marks (who treated Andrew in the hospital's emergency room) or by UVMC's nurses. There are questions of fact concerning some of the Sampson's claims, primarily revolving around Marks's treatment of Andrew, and it has not been conclusively shown whether agency does or does not apply between UVMC and Marks. I GRANT in part and DENY in part the Sampson's motion.

**BACKGROUND**

This case stems from the death of plaintiffs' son, Andrew, following a car accident. The accident occurred around 2:20 a.m. on January 11, 2014, and resulted in Andrew being thrown from his car and laying in a ditch for approximately two hours before first responders were dispatched to the scene. The circumstances surrounding the accident and Andrew's transfer by

---

[1] The other defendants are Dr. Debbie Marks and her employer Pacific Redwood Medical Group (PRMG). Summary judgment was granted to defendants CALSTAR and MEDSTAR on May 5, 2017. Dkt. No. 112.

1  ground ambulance to UVMC are fully described in my prior Order. Dkt. No. 112. The only facts
2  relevant to the determination of this motion concern what happened during the time between when
3  Andrew arrived at UVMC and when he was discharged to the care of CALSTAR nurses for
4  transportation to Santa Rosa Memorial Hospital (SRMH).

Andrew arrived at UVMC in the CALSTAR ambulance at approximately 5:04 a.m. Declaration of Kathleen Humphrey [Dkt. No. 120] Ex. H. at 5. At 5:07 a.m., when the CALSTAR nurses thought that Andrew might be transferred directly to a waiting CALSTAR helicopter for transportation to SRMH, CALSTAR nurses assessed Andrew in the ambulance in the UVMC ambulance bay. Humphrey Decl., Ex. E, CALSTAR Records at 5. Based upon that assessment and according to CALSTAR's records, the UVMC Emergency Room ("ER") physician on duty, Dr. Marks, "accepted" Andrew into the UVMC ER for stabilization at 5:08 a.m. *Id*. Andrew was wheeled into UVMC by the CALSTAR nurses and a MEDSTAR paramedic. *Id*.

During all relevant times, Marks was assisted by UVMC ER charge nurse John Moffatt and nurse Taff Cheneweth. Moffatt was in the ambulance bay when Andrew arrived, observed the last CALSTAR assessment, and stayed with Andrew throughout his time in the UVMC ER. Humphrey Decl., Ex. I, Deposition Transcript of John Moffatt at 19:16-22, 21:13-17, 28:3-6. Marks "joined the patient" when he came through UVMC's doors into the ER. Humphrey Decl., Ex. G, Deposition Transcript of Debbie Marks at 45:11-46:4.[2] Andrew was placed on a "continuous" monitor displaying his vitals, and Marks relied on that monitor to assess Andrew's condition. Marks Depo. Tr. at 31:16-32:11, 34:9-20, 37:2-12.[3] Because, at first, the monitor showed no measureable blood pressure, Marks ordered saline for Andrew. After it was administered, she secured a blood pressure reading. Marks Depo. Tr. at 43:19-22, 44:20-45:4, 46:22-47:2. Marks ordered two units of blood, which nurse Cheneweth went to retrieve. *Id*. at

---

[2] Moffatt testified that Marks was "outside" near the ambulance when CALSTAR brought the patient in. Moffatt Depo. Tr. at 19:23-20:2, 21:13-17.

[3] Plaintiffs' expert Dr. David Goldschmid opines, based on his review of the records, that Andrew was suffering from multiple fractures, blunt chest trauma, and head trauma. Goldschmid Declaration [Dkt. No. 130-4] ¶ 36. UVMC objects to and moves to strike Goldschmid's reports and declarations on a number of grounds. Those objections are addressed below.

71:14-72:15. Andrew remained on the non-rebreather mask and according to Moffatt, Andrew's oxygenation was continuously monitored, including an assessment made without supplemental oxygen and on "room air." Moffatt Depo. Tr. at 46:5-21, 52:20-53: 6.

Marks ordered a portable chest x-ray from which she determined that Andrew had a left hemothorax. Humphrey Decl., Ex H at 3-4, 8-9, 39; Goldschmid Decl. ¶ 36. Based on that, Marks was concerned that Andrew had blunt chest trauma and would need a chest surgeon. Marks Depo. Tr. at 60:6-17.

Marks determined from her examinations that Andrew was unstable due to his critical head injury, multiple traumas including chest trauma and extremity trauma, and neurologic issues (including impaired consciousness) and that he required a higher level of care than UVMC could provide. *Id*. at 55:9-13, 63:8-14, 84:14-20. She called SRMH to determine whether it would accept Andrew. She spoke with Emergency Physician Tucker Bierbaum, disclosing her understanding of the accident, Andrew's vitals, and her conclusions based on her examinations and provision of the saline. Humphrey Decl., Ex. L (Transcript).[4]

Bierbaum accepted the transfer. During that initial conversation, Bierbaum asked whether Andrew needed to be intubated, and then indicated that intubation was Marks' "call." *Id*. Marks informed Bierbaum that Andrew had not been intubated and explained his good gag reflex, "Glasgow" score, and responsiveness. *Id*. Marks considered intubation but her judgment was that he did not require intubation for his breathing or oxygenation, based upon his clear airway, satisfactory breathing and chest sounds, and a good gag reflex. Marks Depo. Tr. at 64:24-65:7, 68:9-21, 147:11-14, 149:11-25. She also considered that intubation could cause further hypotension (which presents risk of further brain injury), could have caused delay in transporting Andrew to SRMH, and would have been difficult given Andrew's confusion and agitation. *Id*. at 68:23-69:6, 76:14-22, 151:12-20. If Andrew needed intubation during transport, Marks was aware

---

[4] Plaintiffs object to UVMC's reliance on the Transcript of the calls between Marks and Bierbaum on the grounds of hearsay, lack of authentication, and best evidence rule. For purposes of ruling on this motion, those objections are OVERRULED. Plaintiffs themselves submit the audio recordings of the calls (Ex. D to Millstein Decl.) and do not point out any errors in the written transcript.

3

that the CALSTAR nurses were capable of intubating him. *Id*. at 70:1-5, 76:2-22, 79:1-2.

At 5:24 a.m., Andrew was transferred back to the care of CALSTAR. Marks discussed the anticipated patient care with the CALSTAR nurses prior to transport, including Andrew's possible ongoing neurologic deterioration and the possible need for intubation. Marks Depo. Tr. at 76:2-77:17. She provided the CALSTAR nurses with blood as the patient was being loaded into the ambulance. *Id*. at 133:12-134: 2. The ambulance departed UVMC to SRMH at 5:28 a.m. Humphrey Decl., Ex. E at 8. As detailed in my prior Order, Dkt. No. 112, shortly thereafter Andrew suffered cardiac arrest and the ambulance was diverted to Healdsburg District Hospital, where Andrew was pronounced as dead at 6:18 a.m.

An autopsy was performed on January 14, 2014, by Arnold Josselson, M.D., a forensic pathologist with the Forensic Medical Group. Josselson determined Andrew's cause of death was blunt force chest injury due to a solo motor vehicle accident. His autopsy findings included multiple cutaneous abrasions and contusions, bilateral rib fractures, bilateral hemothoraces, aspiration of blood into lungs, contusion of left lung, hemorrhage of pancreas, subcapsular hemorrhage of left kidney, hemorrhage surrounding each adrenal, and hemorrhage of each side of the diaphragm. Humphrey Decl., Ex. M (Sonoma County Coroner/Sheriff Records) at 6-13.

As part of the transfer process, Marks completed a UVMC Acute Transfer Form. She completed the form after Bierbaum accepted transfer and while Andrew was being loaded into the ambulance. Marks Depo. Tr. 90:25-91:4. On that form, she stated that she was transferring a patient who had an emergency medical condition, indicated that the patient was "stable," and described the benefits of the transfer. Humphrey Decl., Ex. H at 22. Marks did not check either the box indicating that Andrew was "unstable" or the box that "benefits outweigh risks." Marks also did not fill out the section identifying the risks of transfer. *Id*.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-

4

moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

Generally, where a plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff. *See, e.g.*, *Sanchez v. Kern Emergency Med. Transportation Corp.*, 8 Cal. App. 5th 146, 153 (Cal. Ct. App. 2017), *as modified* (Feb. 16, 2017) (relying on *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 (2007)). Where a moving defendant supports a motion for summary judgment with expert declarations, plaintiff must come forward with conflicting expert evidence. *Id.*

**DISCUSSION**

**I. UVMC'S LIABILITY FOR MEDICAL NEGLIGENCE**

**A. Agency**

Plaintiffs assert that UVMC is liable for Dr. Mark's negligent treatment of Andrew under a theory of agency.[5] In my December 2015 Order denying motions to dismiss, I concluded that

---

[5] To state a claim for medical negligence or malpractice under California law, the plaintiff must establish "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Machado v. Cal. Dep't of Corrs. and Rehab.*, 12-cv-6501-JSC, 2013 WL 5800380, at *5 (N.D. Cal. Oct. 28, 2013) (internal quotations omitted).

5

plaintiffs had adequately alleged agency where they alleged defendant Pacific Redwood Medical Group (PRMG) was Marks' employer and that PRMG held an exclusive contract to provide Emergency Department Services to UVMC and Adventist Health. *Id*. at 6-7. I noted that under California law, "the issue of whether an emergency room doctor can be considered an actual or ostensible agent of a hospital is 'a quintessential question of fact,'" and I allowed the claim to proceed where plaintiffs had alleged that Marks' provision of care was negligent. *Id*. (quoting *Whitlow v. Rideout Mem'l Hosp*., 237 Cal. App. 4th 631, 635 (2015)).

Under California law, a hospital is liable for a physician's malpractice when the physician is "actually employed by or is the ostensible agent of the hospital." *Whitlow*, 237 Cal. App. 4th at 635. No one contends that Marks was an employee of UVMC, so the only question is whether she was its ostensible agent. Though agency is "a quintessential question of fact," usually precluding summary judgment, UVMC contends that agency should be decided in its favor because there is no evidence that Andrew – having suffered a traumatic brain injury and barely conscious when he arrived at UVMC, without having had any input on where he would receive medical treatment – believed Marks was UVMC's employee. Mot. 2; Reply. 10.

In *Mejia v. Cmty. Hosp. of San Bernardino*, 99 Cal. App. 4th 1448 (2002), the California Court of Appeal set out the test for holding hospitals liable for the actions of doctors who were contracted with, not employed by, the hospital. Under that standard, ostensible agency can be inferred "from the mere fact that the plaintiff sought treatment at the hospital without being informed that the doctors were independent contractors." *Id*. at 1457. As the *Mejia* court noted:

> When this standard is applied to the case law governing ostensible agency in the hospital context, it appears difficult, if not impossible, for a hospital to ever obtain a nonsuit based on the lack of ostensible agency. Effectively, all a patient needs to show is that he or she sought treatment at the hospital, which is precisely what plaintiff alleged in this case. Unless the evidence conclusively indicates that the patient should have known that the treating physician was not the hospital's agent, such as when the patient is treated by his or her personal physician, the issue of ostensible agency must be left to the trier of fact.

*Id*. at 1458. UVMC cites no cases explaining how this standard applies in a case like this one where an incapacitated plaintiff is taken to an emergency room by others and, because of his

6

condition and subsequent death, the evidence cannot establish the patient's belief concerning the role of the doctor treating him.[6] But the evidence certainly does not conclusively indicate that Andrew could have known (much less should have known) that the treating physician was not the hospital's agent. *Cf. Mejia*, 99 Cal. App. 4th at 1454, 1459 ("Many courts have even concluded that prior notice [of contractor status] may not be sufficient to avoid liability in an emergency room context, where an injured patient in need of immediate medical care cannot be expected to understand or act upon that information" and agreeing with other courts "that emergency room patients cannot be expected to inquire as to whether treating physicians are independent contractors.").

In these circumstances, and absent apposite case law to support its position, UVMC cannot secure summary judgment on the medical negligence claim on this ground.

### B. Breach of Standard of Care and Causation

#### 1. Dr. Marks

##### a. Standard of Care

Plaintiffs' expert Goldschmid opines that Marks did not meet the applicable standard of care because: (i) the "documentation" for Marks' examinations were "inexact" and "imprecise" and she likely made the wrong assessment of Andrew's Glasgow Coma Score (GCS); (ii) Marks should have intubated Andrew in order to stabilize him and ensure adequate oxygen prior to transportation to SRMH; (iii) Marks should have measured Andrew's blood gases, which would likely have confirmed the need for intubation/assured oxygen supply; (iv) Marks was incorrect when she believed Andrew was "stable" for transportation, as given his injuries and presentation he was likely to materially deteriorate in the hour it would take to get to SRMH; and (v) Marks failed to follow UVMC policies in violation of EMTALA because Andrew's blood pressure and oxygen levels were not constantly monitored under UVMC's own policies. *See generally*

---

[6] Marks testified that she could not obtain Andrew's consent to transfer due to his "altered level of consciousness." Millstein Decl., Ex. A, Marks Depo. Tr. at 127:23-128:9. Similarly, UVMC's conditions of registration form containing the notice of the Hospital's independent contractor relationship with its physicians was not signed by Andrew. Humphry Decl., Ex. H at 17-18.

Goldschmid Decl. [Dkt. No. 130-4].

UVMC's expert, Dr. James Joseph Hershon opines that: (i) Andrew's major head, chest, and internal injuries required immediate care and assistance of a specialist trauma surgeon and a neurosurgeon, who were not available at UVMC; (ii) Marks "stabilized" Andrew with saline and there was no need to intubate because there was no hemothorax and Andrew's blood pressure improved with the saline; (iii) rapid transfer outweighed risks of transfer without intubation; and (iv) there was no intervention of stabilizing care that an ER physician at a UVMC-level of hospital with the lack of specialists onsite could have performed that would have increased the possibility that Andrew would have survived the transport to SRMH. *See generally* Hershon Report [Dkt. No. 123].[7]

In its motion, UVMC did not argue that there is no dispute about Marks' standard of care. Instead, UVMC asserted (as discussed below) that there was no breach by its nurses. UVMC did not challenge plaintiffs' expert's standard of care opinions as to Marks. Instead, in Reply, UVMC argued for the first time that Goldschmid's testimony must be excluded under Cal. Health & Safety Code § 1799.110(c). That section provides that:

> the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience **within the last five years** while assigned to provide emergency medical coverage in a general acute care hospital emergency department. For purposes of this section, "substantial professional experience" shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the **same or similar localities** where the alleged negligence occurred.

Cal. Health & Safety Code § 1799.110 (emphasis added). UVMC contends that Goldschmid: (i)

---

[7] Plaintiffs object to UVMC's reliance on the Hershon Report on the grounds that UVMC did not cite to "particular parts" of Hershon's Report in violation of F.R.C.P. 56(C)(1)(A). Plaintiffs' Evidentiary Objections [Dkt. No. 128], No. 3. While I agree that UVMC's failure to cite to any particular portion of the Hershon Report is remarkably unhelpful, that objection is OVERRULED. Both parties, by filing their evidentiary objections as separate documents, have violated Civil Local Rule 7-3, which requires objections to be filed within the brief or memorandum. Nonetheless, I will review and rule on those objections as necessary. As to plaintiffs' objections to portions of the Hershon Report as improper legal conclusions, those objections (Nos. 20-21) are OVERRULED. UVMC also makes a number of "evidentiary objections" to arguments made by plaintiffs in their Opposition. UVMC Objections [Dkt. No. 136]. Those objections (Nos. 1-6) are OVERRULED.

1  cannot opine on the applicable standard of care as practiced in the rural Ukiah area, because he
2  practiced in the urban Daly City, California area; and (ii) could not speak to causation, as that was
3  outside his area of expertise. Reply 4.

4  Because the challenges to Goldschmid's expert opinions were impermissibly raised in
5  Reply, I will not rule on those challenges here.[8] UVMC may reassert its arguments regarding
6  Goldschmid in a timely filed motion *in limine* or *Daubert* motion, to be heard at the pretrial
7  conference.[9]

8  For purposes of ruling on the motion for summary judgment, Goldschmid's opinions raise
9  a material dispute of fact as to whether Marks/UVMC fell below the applicable standard of care.

### b. Causation

Plaintiffs' expert Dr. Bennet Omalu performed an autopsy on Andrew. Relying on his own autopsy report, as well as the Josselson autopsy report and other records in the case, he opines that Andrew died from blunt force trauma, which was not immediately fatal. Omalu states that had Andrew been stabilized once he arrived at UVMC, "namely intubated," he would more likely than not have survived until he was able to reach definitive care at SRMH. Omalu Decl. [Dkt. No. 132-4], ¶ 19. He opines that the autopsies did not reveal any fatal, catastrophic, or severe traumatic brain injury; instead, Andrew died because of inadequate life support or stabilization. *Id*. ¶ 22. In response, UVMC relies on the opinion of Hershon that there was no intervention or stabilizing care that Andrew could have received at UVMC that would have increased the possibility that he would have survived the transport to SRMH.

Again, and only in Reply, UVMC argues that Omalu is not qualified to testify in this case as to causation and argues, therefore, that plaintiffs have failed to raise a material dispute as to causation. Reply 8-9. UVMC argues that Omalu cannot opine to the standard of care because he

---

[8] UVMC's evidentiary objections based on these same grounds (*i.e*., Goldschmid is not qualified) are likewise OVERRULED. UVMC Evidentiary Objections Nos. 7-41.

[9] Similarly, well after the close of briefing on UVMC's motion for summary judgment and mere days before the hearing on that motion, Marks and PRMG filed a motion seeking permission to file "additional briefing" in support of UVMC's Reply argument to exclude the Goldschmid declaration and opinions. Dkt. No. 144. That request is DENIED. If Marks and PRMG file a timely motion *in limine* on this issue, it will be addressed at the pretrial conference.

does not have relevant experience and as a result cannot testify whether the alleged breach of care – *e.g.*, failure to intubate – was a substantial factor in causing Andrew's death.

As to causation, UVMC argues that because Goldschmid does not testify as to causation and Omalu cannot (because it is outside his area of expertise), summary judgment must be granted in its favor. This argument hinges on my exclusion of the Omalu declaration. As with the challenge to the Goldschmid testimony, I will not exclude Omalu's testimony based on arguments raised for the first time in Reply.[10] UVMC may move to exclude it in a timely filed motion *in limine*.

### 2. UVMC Nurses

UVMC also moves for summary judgment as to the care provided by its nurses – John Moffatt and Taff Cheneweth – arguing that "no violations of the nursing standard of care caused or contributed to Andrew Sampson's injuries." Mot. 23.[11] In cases of nursing negligence, the standard of care requires that the nurses exercise "that reasonable degree of skill, knowledge and care ordinarily possess and exercised by members of their profession under similar circumstances." *Alef v. Alta Bates Hospital*, 5 Cal. App. 4th 208, 215 (1992). A "nurse's conduct must not be measured by the standard of care required of a physician or surgeon, but by that of other nurses in the same or similar locality and under similar circumstances." *Id*.

Plaintiffs rely on the expert opinion of Karen Tomczak that UVMC's nurses' "care, treatment, and transfer of Andrew" fell below the standard of care for nurses "under similar circumstances and locale." Declaration of Karen V. Tomczak [Dkt. No. 131], Ex. B (Expert Report) § 10; Ex. C (Supplemental Expert Report) §§ 1-6. Specifically, Tomczak opines that the

---

[10] UVMC's evidentiary objections based on these same grounds (*i.e.*, Omalu is not qualified) are likewise OVERRULED. UVMC Evidentiary Objections Nos. 42-45.

[11] UVMC also appears to argue that plaintiffs cannot assert a claim of negligence against UVMC due to its nurses' conduct, citing to plaintiffs' response to Special Interrogatory No. 27 which asked them to identify UVMC's failures in care. Mot. 22. In response, plaintiffs identified only the actions of Marks. Humphrey Decl., Ex. O Responses to Rog. Nos. 27-28. However, UVMC does not provide any authority or legal argument that plaintiffs are foreclosed from relying on the nurses' conduct to sustain their medical negligence claim. UVMC also proceeds to discuss the standard of care and lack of causation arguments as to its nurses. I will address this issue, therefore, on its merits.

nurses: (i) failed to complete a "nursing assessment" on Andrew alongside the one allegedly done by Marks; (ii) failed to document or provide a complete chart during Andrew's time in the ER; (iii) failed to "make sure" that UVMC's policies of providing continuous monitoring, frequent vital checks, and implementation of interventions requested by the treating physician were complied with; (iv) failed to take vitals, except once during Andrew's time in the ER; (v) removed Andrew from the O2 non-breather mask (or mischarted this event if Andrew had been on oxygen during this time); (vi) failed to "advocate" for Andrew by suggesting to Marks to start Andrew on blood and complete additional vital checks; and finally (vii) nurse Moffatt failed to accurately complete his portion of the Acute Transfer Form. Tomczak Supp. Report [Dkt. No. 131-3] §§ 1-7.

UVMC does not address the Tomczak Declaration or the care provided by its nurses its Reply. But in its opening brief, UVMC cites generally to the declaration of Patrice Callagy [Dkt. No. 121].[12] Callagy reviewed the actions of the nurses and opined that nurse Moffatt and Cheneweth's actions did not fall below the standard of care. Callagy Report § V. In particular, Callagy opines that the evidence shows: Moffatt cared for Andrew the entire time he was in the ER; any deficiencies in charting do not violate the standard of care because the patient was continuously monitored; Moffatt gave verbal reports to Marks and the CALSTAR nurses at handoff (even if his chart was not yet complete); and, Moffatt completed his charting shortly after the patient left the hospital. *Id*. ¶¶ 7, 8, 9, 13, 14, 15.

The testimony of Moffatt and Marks, in general, supports the opinions of Callagy. No contradictory *evidence* has been identified by plaintiffs on those points. In particular, the evidence shows that Andrew was constantly monitored, that Moffatt provided verbal reports (that are *not* alleged to be inaccurate) to Marks as well as to the CALSTAR nurses when transferring Andrew back to their care, and that Andrew's vitals were constantly observed by Marks and Moffatt on the monitor, even if those vital readings were not documented in the notes.

Even assuming that Tomczak's opinions create a dispute of fact as to some of the nursing

---

[12] Plaintiffs object to UVMC's citation to the Callagy Report on the grounds that UVMC did not cite to "particular parts" of Callagy's Report in violation of F.R.C.P. 56(C)(1)(A). Plaintiffs' Evidentiary Objections, No. 4. As with Hershon, that objection is OVERRULED.

11

care provided (*e.g.*, the alleged failure of Moffatt to accurately complete the Acute Transfer Form, the failure of Moffatt or Cheneweth to record the vitals being taken by the monitor in the chart, the removal of Andrew from the rebreather mask to "spot check" room oxygen), as UVMC points out there is no evidence in the record that these breaches in the standard of care caused or contributed in any way Andrew's death. The only causal link between the care provided at UVMC and Andrew's injury identified by plaintiffs' own experts is the lack of intubation, and possibly the lack of provision of blood while Andrew was at UVMC. Plaintiffs cite no cases *imposing on nurses* the decision to intubate or provide blood when there is an attending ER physician present who is directing the patient's medical care. Absent relevant case law imposing these obligations on UVMC's nurses in this situation, there is no evidence by expert or otherwise to support plaintiffs' claim that the nurses' alleged breach of the standard of care caused Andrew any injury.

Partial summary judgment is GRANTED to UVMC as to the conduct of Moffatt and Cheneweth.

### C. Revocation of Marks' Credentials

Plaintiffs argue UVMC was negligent for failing to revoke Marks' credentials as a result of an accusation by the California Medical Board regarding Marks' removal of a patient from anti-psychotic medications without consulting the patient's physician, and the private settlement of that accusation by Marks in 2010. Millstein Decl., Ex. F. UVMC's expert, Dr. Elliot S. Nipomnick [Dkt. No 122], notes that the facts surrounding the Accusation and Settlement did not involve Marks' work as an emergency room physician.[13] Moreover, the decision regarding her continued employment was made by PRMG, not UVMC. Based on those facts, he opines that UVMC did not violate any of its procedures by not revoking Marks' privileges following the Accusation and Settlement. Nipomnick Decl. at ECF Pg. 16 of 23.

Plaintiffs respond by relying on Goldschmid's opinion that the Accusation and Settlement shows Marks' lack of judgment, and that such lack of judgment would have caused him not to rehire her. Goldschmid Decl. ¶ 52. Plaintiffs argue, therefore, that UVMC should have revoked

---

[13] Plaintiffs object generally to UVMC's reliance on the Nipomnick Report, because UVMC fails to cite particular portions of that Report. That objection is OVERRULED.

Marks' privileges, or at least implemented close supervisory protocols to make sure no severe misjudgments occurred in the future. Because UVMC took neither of these actions with respect to Marks, UVMC fell below the standard of care for hiring and retention of physicians. Oppo. 26.

No party, however, cites *any* statute or case law regarding when a hospital may be held negligent for failure to revoke privileges of an ER doctor based on an Accusation and Settlement by the California Medical Board, much less one where the Accusation did not arise from the doctor's conduct in an ER setting. To the extent UVMC seeks summary judgment on this claim, its motion is DENIED because of inadequate briefing.

## II. EMTALA

EMTALA, also known as the "Patient Anti-Dumping Act," was enacted because "Congress was concerned that hospitals were dumping patients who were unable to pay for care, either by refusing to provide emergency treatment to these patients, or by transferring the patients to other hospitals before the patients' conditions stabilized." *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001). EMTALA requires hospitals to conduct "an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C.A. § 1395dd(a).

EMTALA also places restrictions on transferring patients who are not stabilized. *See* 42 U.S.C. § 1395dd(c)(1). A hospital may only transfer an unstabilized patient if (i) that patient "in writing requests transfer to another medical facility," or (ii) "a physician . . . has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual." *Id*. "To stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A).

### A. UVMC's Alleged Violation

UVMC argues that it and its staff fully complied with EMTALA by performing a Medical Screening Examination (MSE) in order to identify Andrew's condition, sufficiently stabilized Andrew in its ER, and made a determination in conjunction with SRMH to transfer Andrew to

13

their higher-level trauma center.

### 1. Disparate Medical Screening

EMTALA does not penalize a hospital for providing a screening that falls beneath the relevant standard of care. Instead, the statute's focus is to prevent "disparate" screenings. A "hospital only must provide a screening examination that is comparable to that offered to other patients with similar symptoms." *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1255 (9th Cir. 2001). A hospital satisfies EMTALA if "it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" *Id.*, 246 F.3d at 1256.

Plaintiffs allege that UVMC failed this "disparate screening" measure by failing to follow its own policies. More specifically, plaintiffs state that UMVC failed to follow its own policies (and therefore provided Andrew a disparate screening) when it failed "to continuously monitor" Andrew. Plaintiffs point to the charts for the 11 minutes Andrew was in the ER and note that there are only a few entries showing monitoring, with only one or two showing blood pressure. Oppo. 8. However, the uniform and undisputed testimony of Marks and Moffatt is that during those 11 minutes, Andrew was attached to a continuous monitor that was being viewed by Marks and Moffatt, and that Moffatt was continuously with Andrew once Andrew arrived in the ER. That Marks in her deposition could not remember how often the monitor was set to record blood pressure and had no independent recollection of what she saw on that monitor other than what was in her notes (which represented one reading) does not undermine that Marks and Moffatt were monitoring the patient during the time from his arrival at UVMC throughout his time in the ER. The undisputed facts show that, with respect to time within the ER, Andrew was continuously monitored.

Plaintiffs also complain that after Andrew was "handed off" to the CALSTAR nurses, he sat in the ambulance on UVMC property for another 13 or so minutes until the ambulance left. Humphrey Decl., Ex. B MAMC 0118-0119. During that time, plaintiffs allege that Andrew was on UVMC property but not monitored by UVMC personnel as required by UVMC's policy.

14

1 Millstein Decl., Ex. C (UVMC EMTALA Policy). at 4. However, plaintiffs do not dispute that by that time, Andrew had been "transferred" to the control of the CALSTAR nurses. That "transfer" was consistent with UVMC's policies.

Plaintiffs present no facts that the monitoring Andrew received departed from the monitoring provided to other patients. There is similarly no evidence that Andrew's monitoring violated UVMC's EMTALA policies. The facts, when construed in a light most favorable to plaintiffs, do not show a violation of any UVMC EMTALA policies requiring continuous monitoring. Partial summary judgment is GRANTED to UVMC on this claim.

### 2. Failure to Certify/Failure to Stabilize

As noted above, EMTALA also requires a physician to certify that a patient is stable before transfer (in other words, given UVMC's interventions no material deterioration of Andrew's condition was likely to result from or occur during the transfer) *or* to certify that the patient is unstable but the benefits of transfer outweigh the risks of transfer.

It is undisputed that on the UVMC Acute Transfer Form, Marks marked Andrew as "stable" prior to transportation. Humphrey Decl., Ex. H. During her deposition, she characterized that as a mistake, and that in her haste she did not realize that she had checked the wrong box and had not accurately completed Acute Transfer Form. Marks Depo. Tr. at 90:23-92:19. She intended to check the box stating that she was transferring a patient with an unstable emergency medical condition. UVMC notes that the Acute Transfer Form repeated Marks' diagnosis ("blunt chest trauma" and "head trauma") and the Form explains the "medical benefits" for the transfer were to secure a trauma surgeon and neurosurgeon – *i.e.*, a "level of care/service not available at this facility." Humphrey Decl., Ex. H. UVMC argues that the record-- including Marks deposition testimony, Marks' recorded note and her "Power Note" both sent to Bierbaum, her calls with Bierbaum, and the Acute Transfer Form itself that fully described the patient's condition and his need for expedited care and transfer--shows that all involved knew that Andrew was unstable and that Marks's judgment was that transfer was nonetheless necessary to address his chest and neurological trauma that exceeded the capacity of UVMC. Marks Depo. Tr. at 84:14-20, 92:10 – 93:15, 122: 3-19; 124: 1-23; Humphrey Decl., Ex. L (Audio Transcript); Humphrey

Decl., Ex. K, Deposition Transcript of Tucker Bierbaum at 20:9-17; *see also* Nipomnick Decl., at ECF pg. 10 ("There was never a question that the patient was unstable before, during, and after the emergency department encounter.").

Plaintiffs argue that Marks checked the "stable" box, that it was intentional at the time, and that she likewise failed to check the box and certify that the benefits of transfer outweighed the risks for an unstable patient. They rely on Marks' own notes where she stated that Andrew's "chief complaint" was "unstable vitals" and that, on discharge, his "vitals [were] stabilized for further CalStar transport." *Id*. at 4; Marks Depo. Tr. at 130:9-131:2 ("The patient presented with hypotension, and I stabilized the hypotension.... I stated that the vitals were stabilized for further transport."). They also rely on Marks' response to Special Interrogatories, where she declared that Andrew's "vitals were stabilized for further transport to Santa Rosa Memorial. Stabilization was considered satisfactory for definitive care." Millstein Decl., Ex. D (Responses to Interrogatories 5,6,8,11,12,14,15,17,18,20, 21); *see also id*. (Response to Interrogatory 16 "the records reflect that defendants transferred the decedent in stable condition in accordance with EMTALA to a higher level medical facility.").

Plaintiffs contend, first, that there is a question of fact for the jury to decide whether Marks believed that Andrew was "stable" as defined under the statute (as marked on the Transfer Form and attested to in her discovery responses) or whether she (as she now claims) was simply mistaken.[14] They note that in an impermissible transfer case under EMTALA, motive is irrelevant. *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 253 (1999) (holding "that § 1395dd(b) contains no express or implied 'improper motive' requirement").

Plaintiffs also assert that even if Marks' position that the failure to mark the "unstable" box on the Acute Transfer Form was a legitimate mistake, she still did not fill out the "risks" to the transfer or check the box indicating that the benefits outweighed the risks of transfer. Humphrey Decl., Ex. H at 22 (listing benefits but no risks, and not checking "benefits outweigh risks" box).

---

[14] Plaintiffs rely on Marks deposition testimony where she claims she takes the Acute Transfer Forms seriously and has never filled one out wrong before. Marks Depo. Tr. at 98:4-99:23, 128:15-18.

16

In the end, they argue that it is a question of fact for the jury to resolve whether the other evidence (including Marks' notes and conversations with Bierbaum) is sufficient to show that Marks weighed benefits and risks and believed the benefits outweighed the risks, because there is nothing in the record to show that Marks' appreciated or considered any risks that might arise during transport.

UVMC responds that the mere failure to check the correct box cannot be the basis of an EMTALA violation. UVMC relies heavily on *Vargas By & Through Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202 (9th Cir. 1996). In that case, it was undisputed that the patient received an appropriate medical screening examination at the initial hospital and was in an unstable condition when transferred. The question was whether the doctor's "failure to include a written summary of the specific risks of transfer on the transfer certificate makes [the hospital] liable under EMTALA." *Id*. at 1204. The court rejected the argument that a failure to accurately or fully complete a transfer form could result in liability.

> While such a contemporaneous record may be the best evidence of what a physician was thinking at the time, we cannot accept the proposition that the only logical inference to be drawn from the absence of a written summary of the risks is that the risks were not considered in the transfer decision. Other factors might account for the absence of such a summary, such as the time-pressure inherent in emergency room decision-making. Although a contemporaneous record is certainly preferable, we believe it would undermine congressional intent to foreclose consideration of other evidence surrounding the transfer decision.

*Id*. at 1205. It was the failure to perform the assessment, not the failure to complete the form itself, that could lead to a violation under EMTALA. *Id*.

While there are difference between *Vargas* and this case – including that the doctor in *Vargas* admitted the patient was unstable, *certified* that the benefits outweighed the risks, but failed to list the risks on the form – the import from *Vargas* is that *other evidence* in addition to simply what was written on the form is relevant to whether there was a violation of EMTALA.[15]

---

[15] Plaintiffs argue that *Vargas* is undermined by the Supreme Court's decision in *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 253 (1999) (holding "that § 1395dd(b) contains no express or implied 'improper motive' requirement"). But *Roberts* dealt only with the issue of whether improper motive was relevant to a § 1395dd(b) claim. Plaintiffs also rely on *Kilcup v. Adventist Health, Inc.*, 57 F. Supp. 2d 925, 931 (N.D. Cal. 1999), *aff'd*, 232 F.3d 894 (9th Cir. 2000), where

17

That other evidence is relevant, however, does not mean summary judgment is available on this record.

UVMC points to Marks' deposition testimony as support that Marks did weigh the risks versus benefits; for example, she recognized that during the transport, there was a possibility (not a probability in her mind) that Andrew might need intubation. Marks Depo. Tr. at 86:14-23. UVMC also highlights Marks' deposition testimony that she was concerned about Andrew's need for cardiac and neurological treatment that could not be provided at UVMC, and that those concerns were the basis for her belief that immediate transportation without intubation was the best course of action. These arguments show that material disputes of fact exist. The issue is whether Marks unreasonably determined that Andrew was stable enough for transportation in light of the saline she provided and her belief that an urgent transfer was necessary without intubation *or* whether Marks was simply mistaken on the Acute Transfer Form and her belief all along was that Andrew was unstable but she nonetheless performed the risks vs. benefits analysis and determined transfer was the best course.[16] Given the contradictory evidence in the case (the Acute Transfer Form, the discovery responses, the deposition testimony), there are disputes of material fact that the jury must resolve.

**B.  Damages**

UVMC argues that plaintiffs – as parents of the person treated at UVMC – are third parties who do not have standing to pursue the EMTALA claim. UVMC cites no cases on point. It relies on *Pauly v. Stanford Hosp.*, No. 10-CV-5582-JF PSG, 2011 WL 1793387 (N.D. Cal. May 11,

---

the court determined that the failure of a physician to "certify in writing" that the medical benefits expected from transfer to another medical facility outweighed the increased risks to the individual of transfer would not support liability under EMTALA where the physician had expressly discussed the risks and benefits of transfer with the patient's relatives and the patient himself signed an informed consent form. The circumstances here, of course, are different, because no family was present and Andrew could not give consent.

[16] UVMC's expert, Dr. Elliot S. Nipomnick characterizes Andrew's condition at time he left UVMC's control as "partial stabilized within the capabilities of the facility by the infusion" of the saline. Nipomnick Report [Dkt. No. 122] at ECF pg. 10 of 23.   Plaintiffs object to other portions of the Nipomnick Report as improper legal conclusions. I do not rely on any of the Nipomnick opinions challenged by plaintiffs, so those objections (Evidentiary Objections 5-15), are OVERRULED as moot.

18

2011), but there the district court concluded only that "[e]xtending a private right of action to a third party *when the individual patient is still living* would result in a significant expansion of liability for hospitals subject to EMTALA's provisions." *Id*., at *5 (emphasis added). UVMC also relies on *Zeigler v. Elmore Cty. Health Care Auth.,* 56 F. Supp. 2d 1324, 1327 (M.D. Ala. 1999), where a mother and a daughter attempted to both assert EMTALA claims related to the daughter's treatment, a proposition the court rejected. UVMC cites no cases excluding survivors from bringing a case on behalf of a decedent under EMTALA and other cases have allowed similarly situated claims to proceed. *See Jackson v. E. Bay Hosp*., 246 F.3d 1248, 1253 (9th Cir. 2001) (survivors asserted EMTALA claims regarding decedent's treatment).

UVMC also argues that EMTALA "general damages" are not available because Cal. Code Civ. Proc. § 377.34 (allowing for survivor actions) bars recovery of "general damages" by an estate upon injured party's death. Plaintiffs respond by pointing out that they are also seeking damages for wrongful death under Cal. Code. Civ. Proc. § 377.60, which does not bar general damages. Plaintiffs rely on *Jackson v. E. Bay Hosp.,* 980 F. Supp. 1341, 1355 (N.D. Cal. 1997), but that case did not answer the question; it merely ordered supplemental briefing. Plaintiffs also cite *Arrington v. Wong*, 237 F.3d 1066, 1074 (9th Cir. 2001), which considered the interplay between EMTALA and Hawaii law but did not address damages available under EMTALA in a California survivor action.[17]

UVMC finally argues that the EMTALA damages (if any) cannot exceed the cap on medical negligence damages imposed under California's Medical Injury Compensation Reform Act, California Civil Code § 3333.2 ("MICRA"). Mot. 3 n.5. UVMC argues that an EMTALA "failure to stabilize claim" falls within the MICRA cap. *Romar ex rel. Romar v. Fresno Cmty. Hosp. & Med. Ctr*., 583 F. Supp. 2d 1179, 1185 (E.D. Cal. 2008) (noting a failure to stabilize EMTALA claim would fall within MICRA cap, but disparate medical screening claims would not, because those are not "medical negligence" claims). In *Barris v. Cty. of Los Angeles*, 20 Cal. 4th

---

[17] As neither side has cited any applicable cases arising under California law, I will not grant summary judgment on this ground. However, a motion *in limine* supported by relevant case law may be brought for determination at the pretrial conference.

101 (1999), the California Supreme Court concluded that damages awarded under EMTALA for failure to stabilize were subject to the state's MICRA cap. Therefore, absent contrary authority, the EMTALA claim that is left – failure to certify and/or stabilize – appears to fall within the MICRA cap.

## CONCLUSION

Therefore, partial summary judgment is GRANTED to UVMC as to medical negligence for the conduct of UVMC's nurses and on the EMTALA disparate monitoring claim. The EMTALA damages will also be limited by California's MICRA cap. UVMC's motion for summary judgment is otherwise DENIED.

**IT IS SO ORDERED.**

Dated: June 30, 2017

William H. Orrick
United States District Judge